IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| GEORGE D. METZ, II, )<br>)<br>   Plaintiff, )<br>)<br>v. )<br>)<br>D. BRIDGES, *et al.*, )<br>)<br>   Defendants. ) | Case No. 1:22-cv-56-ECM-SMD |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pro se plaintiff George D. Metz, II ("Metz") styles himself as an "independent journalist/activist." Compl. (Doc. 1) p. 7, ¶ 1. In an action that appears deliberately calculated to provoke a potentially unlawful police response, he and an unidentified colleague[1] entered the Houston County Department of Human Resources ("DHR") building with a video camera and began filming in the lobby. *Id.* at ¶¶ 7-9. Police responded, and when Metz refused to produce identification, he was handcuffed and searched. *Id.* at ¶¶ 9-16. Metz now brings 42 U.S.C. § 1983 claims against Dothan Police officers D. Bridges ("Officer Bridges") and J. Dodson ("Officer Dodson") (collectively "Defendants") for illegal seizure/false arrest and illegal search in violation of his Fourth and Fourteenth Amendment rights. Compl. (Doc. 1) p. 10, ¶¶ 22-26. Before the Court is Defendants' Joint Motion to Dismiss asserting qualified immunity. Mot. (Doc. 10).

---

[1] Based on an action filed in this Court involving the same factual scenario, *see Joe D. Southard, II v. Officer D. Bridges and Officer J. Dodson*, 1:22-cv-333-ECM-SMD, it is believed that this man is Joe Southard, II, but there are no facts presently before the Court establishing his identity.

Accepting Metz's well-pleaded facts as true and viewing the video evidence in the light most favorable to him, the undersigned finds that Metz has alleged the violation of clearly established constitutional standards and recommends that Defendants' Motion to Dismiss (Doc. 10) be **DENIED**.

## I.  PARTIES & CLAIMS

Count I is a § 1983 claim against Officer Bridges in his individual capacity for illegal seizure/false arrest. It alleges that Officer Bridges unlawfully seized Metz in violation of his Fourth and Fourteenth Amendment rights. Compl. (Doc. 1) p. 10, ¶¶ 22-24. Count II is a § 1983 claim against Officer Dodson in his individual capacity for illegal search. It alleges that Officer Dodson unlawfully searched Metz in violation of his Fourth and Fourteenth Amendment rights. Compl. (Doc. 1) pp. 10-11, ¶¶ 25-27. Metz seeks unspecified compensatory and punitive damages. Compl. (Doc. 1) p. 11, ¶ 29.

## II.  JURISDICTION

This Court has federal question jurisdiction because Metz's § 1983 claims arise under federal law. 28 U.S.C. § 1331.

## III.  PROCEDURAL POSTURE

The undersigned issued a prior recommendation recommending denial of Defendants' motion. Recommendation (Doc. 28). Defendants objected, in part, because the undersigned did not consider video shot by Metz that he referenced in his Complaint

and body camera video from Sgt. Evans that Defendants submitted.[2] Defs' Obj. (Doc. 29) pp. 5-6. Metz agreed that these videos should be considered. Metz Obj. (Doc. 35) p. 3.

The Eleventh Circuit has allowed district courts to consider police body cam footage referenced in the complaint or submitted with a motion to dismiss without converting the motion to summary judgment if it is "central to plaintiff's claim, and its authenticity is unchallenged." *Cantrell v. McClure*, 805 F. App'x 817, 819 n.2 (11th Cir. 2020) (unpublished). *See also McDowell v. Gonzalez*, 820 F. App'x 989, 992 (11th Cir. 2020) (unpublished) ("the district court properly considered both the amended complaint and body camera footage that was attached to the motion to dismiss because the body camera footage was central to the amended complaint and was undisputed"). However, Judge Brasher has raised concerns with this practice and pointed out that the Circuit has never addressed whether audiovisual evidence can be incorporated by reference in a published precedential opinion. *J.I.W. v. Dorminey*, 2022 WL 17351654, at *8 (11th Cir. 2022) (Brasher, J. concurring). The undersigned shares these concerns.

Nevertheless, because the parties all agree that the video evidence should be considered, the undersigned vacated his prior recommendation and reviewed the video evidence under Rule 12(b)(6). Order (Doc. 38). When reviewing the video evidence at the motion to dismiss stage, all ambiguities must be construed in Metz's favor. *Cantrell*, 805 F. App'x at 819 n. 2. Unless the video clearly contradicts Metz's well-pleaded factual

---

[2] Upon review of the evidence submitted by Defendants purporting to be body-camera footage from Sgt. Evans, it appears that the body-camera footage is another copy of the footage from Metz.

allegations, they should be accepted as true under Rule 12(b)(6). *Id.* (*citing Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

IV. **FACTUAL ALLEGATIONS**

Metz is an "independent journalist/activist." Compl. (Doc. 1) p. 7. In June 2020, he and an unnamed colleague entered the Houston County Department of Human Resources ("DHR") building (the "building") with a video camera and began filming. *Id.* at 7; Metz Video (Doc. 39). Immediately after entering the building, a DHR security guard informed Metz that he could not have a camera in the building and asked him to leave. Metz Video (Doc. 39) at 01:06, 01:11. Metz refused, claiming he had a right to video because the building is a public space. *Id.* at 01:09, 01:16. After repeatedly asking Metz to leave, the security guard instructed a DHR employee to call 911. *Id*. at 01:48.

Officer Bridges responded to the scene approximately five minutes later. *Id.* at 07:01. He spoke to a DHR employee, who informed him that Metz was "videoing down here" and that Metz was from Bolt Action News Group. *Id.* at 07:11-0:7:20. Officer Bridges asked Metz if he had identification. *Id.* at 07:37. Metz told him no. *Id.* at 07:38. Officer Bridges then told Metz that he needed proof of identification or his information. *Id.* at 07:48. Metz asked Officer Bridges what crime he suspected him of. *Id.* at 07:50. Officer Bridges stated: "I asked you for your information, so you're going to provide me with your information. It's that simple." *Id.* at 7:58. After Metz's colleague also refused to provide Officer Bridges with his information, Officer Bridges stated: "Alright, we're going to make this real simple, guys. Provide me with your information . . . Alright, we'll just do this." *Id.* at 08:08-08:18. Officer Bridges then handcuffed Metz and his colleague and told

4

them that they would remain handcuffed until they provided their information. *Id.* at 08:19-08:25. He directed Metz and his colleague to take a seat, *id.* at 09:04, and asked: "So are you going to provide your information or not?," *id.* at 09:15.

Shortly thereafter, another DHR employee, who was speaking to someone (possibly the DHR director) over the telephone, told Metz that he needed to leave due to client confidentiality. *Id.* at 09:37-10:37. Metz responded that he could not leave because he was in handcuffs. *Id.* at 10:43. Twelve minutes later, Officer Dodson arrived with his supervisor and two other officers. *Id.* at 22:39. Officer Dodson and the supervising officer spoke with a DHR employee in the hallway. *Id.* at 23:26. The employee informed Officer Dodson and the supervising officer that the DHR security guard had asked Metz and his colleague to leave because they were filming in the building without permission. *Id.* at 23:26-24:01.

After speaking with the DHR employee, Officer Dodson approached Metz and requested Metz's press identification, and Metz refused absent Officer Dodson's articulation of a specific crime that he was suspected of. *Id.* at 25:53, 27:42, 29:12. Officer Dodson told Officer Bridges to "[i]dentify them and write a report. Suspicious circumstances." *Id.* at 30:19. Officer Dodson and the supervising officer returned to the hallway, and Officer Bridges again requested identification, which Metz again refused to provide. *Id.* at 30:35.

Officer Dodson returned with the DHR supervisor, who informed Metz that he was being banned from the building. *Id.* at 38:45-39:06. Officer Dodson told Metz that he needed to provide his identification so that they could write a report. *Id.* at 39:10-39:35. When Metz refused to provide his identification, Officer Dodson directed Metz to stand

5

and then, seconds later, to turn. *Id.* at 39:40-40:02. Officer Dodson stated: "You have no identification on you, do you?" *Id.* at 40:03. Metz responded: "No, sir," and Officer Dodson directed Metz to sit back down. *Id.* at 40:03-40:06. Officer Dodson then directed Metz's colleague to stand up. *Id.* at 40:07. While Officer Dodson was with Metz's colleague, Metz stated: "Oh, inside the pocket—that's not a *Terry*." *Id.* at 40:19.

After another request for his information, Metz informed Officer Bridges that he would "only give [his] information under threat of arrest." *Id*. at 40:52. Metz's colleague asked to speak with the supervising officer. *Id*. at 41:07. The supervising officer emerged from the hallway and stated: "So y'all's reason to be here is to film in a public space inside a public building." *Id.* at 44:24. Metz confirmed the purpose and indicated that he was finished videoing and would have already left had he not been placed in handcuffs. *Id.* at 44:40, 44:55. The supervising officer returned to the hallway. *Id.* at 44:56. Eighteen minutes later, the supervising officer told Metz to stand up and turn around. *Id.* at 1:02:44. Officers removed handcuffs from Metz and his colleague. *Id.* at 1:02:50. The supervising officer then stated: "There's a reason for you not to be up here but, like I said, right now y'all are free to go. I can't, you know, like I explained to them, I can't stop you from filming and y'all are free to go." *Id.* at 1:03:33.

Metz was handcuffed in the DHR lobby for a total of approximately 54 minutes. He was never told he was under arrest, put in a police car, booked, or charged with any crime.

6

V. **LEGAL STANDARD**

 A. **Pro Se Litigants**

Federal courts must "show a leniency to pro se litigants not enjoyed by those with the benefit of a legal education." *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) (italics removed). A document filed pro se is "to be liberally construed," and a pro se complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotations omitted). Despite this leniency, a pro se plaintiff must still comply with the threshold requirements of the Federal Rules of Civil Procedure. *Beckwith v. Bellsouth Telecomms. Inc.*, 146 F. App'x 368, 371 (11th Cir. 2005). Importantly, a district court "does not have license to rewrite a deficient pleading," and—like complaints drafted by attorneys—a pro se complaint must be dismissed if it fails to state a claim on which relief may be granted. *See, e.g.*, *Osahar v. U.S. Postal Serv.*, 297 F. App'x 863, 864 (11th Cir. 2008); *Albrata v. Advan, Inc.*, 490 F.3d 826, 834 (11th Cir. 2007).

 B. **Motion to Dismiss**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain factual allegations sufficient "to raise a right to relief beyond the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to state a claim. *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Twombly*, 556 U.S. at 555). The Eleventh Circuit explains that "complaints . . . must now contain either direct or inferential

allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Randall v. Scott*, 610 F.3d 701, 707 n. 2 (11th Cir. 2010) (internal quotation and citation omitted). To determine whether a plaintiff has stated a claim, the court should first "eliminate any allegations in the complaint that are merely legal conclusions" and then determine whether the well-pleaded factual allegations of the complaint—assuming their veracity—plausibly give rise to an entitlement to relief. *Amer. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (internal quotation and citation omitted). "The plausibility standard is met only where the facts alleged enable 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (quoting *Twombly*, 550 U.S. at 556).

## VI. ANALYSIS

### Qualified Immunity

Officers Bridges and Dodson assert that they are entitled to qualified immunity on Metz's claims. Mot. (Doc. 11) pp. 9-24. Qualified immunity completely protects government officials sued in their individual capacities unless their conduct violates "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (internal quotes and citation omitted). The Eleventh Circuit explains that "[u]nless the government official's act is so obviously wrong, in light of pre-existing law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity." *Snider v. Jefferson State Cmty. Coll.*,

344 F.3d 1325, 1328 (2003). Qualified Immunity is a powerful doctrine that provides a true "*immunity from suit* rather than a mere defense to liability[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis original).

The purpose of qualified immunity is to allow government officials to carry out their duties without fear of personal liability or harassing litigation. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The doctrine "prevents public officials from being intimidated—by the threat of lawsuits that jeopardize the official and her family's welfare personally—from doing their jobs." *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation[.]" *Mitchell*, 472 U.S. at 526. Therefore, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). *See also Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) ("[b]ecause of the purpose served by the doctrine of qualified immunity, a valid defense based upon it must be recognized as soon as possible, preferably at the motion to dismiss or summary judgment stage").

"The applicability of qualified immunity is a question of law to be decided by the court." *Willingham v. Loughman*, 261 F.3d 1178, 1184 (11th Cir. 2001). To receive qualified immunity, a government official must first show that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts occurred. *Hinson*, 927 F.3d at 116; *Maddox*, 727 F.3d at 1120. The burden of proof then shifts to the plaintiff to show that qualified immunity is not appropriate. *Id.* Challenged actions are within the scope of an official's discretionary authority when they were (1) undertaken

9

pursuant to the performance of his duties, and (2) within the scope of his authority. *Hinson*, 927 F.3d at 116; *Gray v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006). In applying this test "'a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'" *Id.* (quoting *Harbert Int'l v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)).

Here, the video establishes that the defendant police officers were on duty responding to a 911 dispatch when they allegedly violated Metz's constitutional rights. Therefore, they have established that they were acting within the scope of their discretionary authority and are entitled to qualified immunity. *Hinson*, 927 F.3d at 116 ("Defendant Officers readily satisfy [the discretionary authority] requirement, as they undertook all of the challenged actions while on duty as police officers conducting arrests and investigative functions"). Metz has the burden of overcoming their immunity. *Id.* To do so, he must plead facts that, when viewed in the light most favorable to him, show (1) that the defendant officers violated his constitutional rights, and (2) that it was clearly established at the time of the incident that the actions of the defendant officers were unconstitutional. *Id.*; *Maddox*, 727 F.3d at 1120. The clearly established inquiry is undertaken "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The court has discretion to address the two prongs of the qualified immunity analysis in whatever order "will best facilitate the fair and efficient disposition of each case" and may "determine that the right allegedly violated was not clearly established

without deciding whether a constitutional violation occurred at all." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009); *Maddox*, 727 F.3d at 1121.

The Eleventh Circuit instructs that "[w]hile the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be . . . raised and considered on a motion to dismiss." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). However, raising qualified immunity at the motion to dismiss stage "subjects the defendant to a more challenging standard of review than would apply on summary judgment," *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004), because at the motion to dismiss stage, "it is the defendant's conduct as alleged in the complaint that is scrutinized." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

### A. Unlawful Seizure/False Arrest Claim Against Bridges

Count I is a § 1983 claim against Officer Bridges for illegal seizure/false arrest in violation of the Fourth and Fourteenth Amendments. Compl. (Doc. 1) ¶¶ 22-24.

#### 1. Metz Was Seized When Bridges Handcuffed Him

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. In an encounter with police, a person is seized under the Fourth Amendment if a reasonable person under the circumstances would not have believed that he was free to leave. *INS v. Delgado*, 466 U.S. 210, 215 (1984) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Metz alleges, and the video evidence confirms, that Officer Bridges handcuffed him approximately one minute after arriving on the scene. Compl. (Doc. 1) ¶ 10. At that point, Metz was not free to leave, and he was seized within the meaning of the Fourth Amendment.

11

## 2. Metz Lacked Arguable Reasonable Suspicion for a *Terry* Stop

Police may seize a person for a brief investigatory *Terry*[3] stop when (1) they have reasonable suspicion that the person was, or is about to be, involved in criminal activity, and (2) the seizure is reasonably related in scope to the circumstances justifying it in the first place. *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). The reasonable suspicion necessary for a *Terry* stop "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). However, "the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* Police "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 123-24 (internal quotes and citation omitted). Courts should look to the totality of the circumstances when determining if police had reasonable suspicion, and defensive behavior toward police is a relevant factor. *Jordan*, 635 F.3d at 1187.

Within the qualified immunity framework, an officer is entitled to qualified immunity if he had arguable reasonable suspicion for the stop, even if he was mistaken. *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000). Arguable reasonable suspicion exists if a reasonable officer under the circumstances could have believed the subject was, or was about to be, involved in criminal activity. *Id.*

Turning to the facts here, Metz alleges, and the video evidence confirms, that he entered the DHR building and began videoing the lobby area. Prior to Officer Bridges's

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

arrival, DHR's security guard asked Metz to leave and, when he refused, a DHR employee called 911.  Upon Officer Bridges's arrival, he spoke to a DHR employee who informed him that Metz and his colleague were with Bolt Action News Group and were videoing in the lobby.  The video shows that she did not inform Officer Bridges that the security guard had asked Metz to leave, and he refused. Officer Bridges then requested identification from Metz and his colleague and, when they refused, he handcuffed them.  Because this is a Rule 12 motion and Defendants have chosen not to provide their version of events, the undersigned does not know what information was conveyed to Officer Bridges by the 911 dispatcher or what other information he may have had prior to arriving on the scene.

      Whether reasonable suspicion exists is determined by an objective review of the factual circumstances facing the officer, not the officer's subjective state of mind.  *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).  Construing the facts here in the light most favorable to Metz, Officer Bridges did not have reasonable suspicion or even arguable reasonable suspicion for a *Terry* stop.  The only thing the video establishes is that Officer Bridges knew that Metz was videoing in the DHR lobby.  This is not criminal activity.  "The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). Like all First Amendment protections, this right is "subject to reasonable time, manner and place restrictions." *Id.* Of course, "the First Amendment does not guarantee access to property just because it is owned by the government." *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011). Instead, "courts use 'forum analysis to evaluate government restrictions on purely private

13

speech that occurs on government property.'" *Keister v. Bell*, 879 F.3d 1282, 1288 (11th Cir. 2018) (quoting *Walker v. Tex. Div. Sons of Confederate Veterans, Inc.*, ⸺ U.S. ⸺ –, 135 S. Ct. 2239, 2250 (2015)).

While the act of videoing the DHR lobby seems intentionally provocative and likely calculated to elicit a police response, it is not—in and of itself—criminal, suspicious, or indicative of a crime. *See Dunn v. City of Fort Valley*, 464 F. Supp. 3d 1347, 1364-65 (M.D. Ga. May 19, 2020) (finding that because the plaintiff "only recorded in public areas and there are no policies enacted (much less published) to establish any time, place, and manner restrictions, the [c]ourt is unpersuaded that [the plaintiff's] actions of videotaping . . . public property and public officials at work is the type of behavior that should be classified as not usual for law-abiding individuals") (internal quotations removed). Therefore, the mere fact that Metz was videoing in the DHR lobby does not give rise to reasonable suspicion or even arguable reasonable suspicion to detain him.

Construing the Complaint and video evidence in the light most favorable to Metz, it shows that Officer Bridges handcuffed Metz because he refused to provide identification. This was unlawful. When Officer Bridges entered the DHR building, he had no reasonable suspicion to even briefly detain Metz. At that point, it was strictly a consensual encounter. *See Florida v. Bostick*, 501 U.S. 429, 434-35 (1991). Officer Bridges was free to ask, but not require, Metz to provide his identification, and Metz was free to disregard Bridges and go about his business. *Id.*; *Florida v. Royer*, 460 U.S. 491, 497-498 (1983) (person approached by police in a consensual encounter need not answer any questions and may decline to listen to the questions at all and go on his way). *See also Moore v. Pederson*,

806 F. 3d 1036, 1045 (11th Cir. 2015) ("Because [the arresting officer] did not have a warrant and he was not conducting a lawful *Terry* stop when Moore was inside his home, Moore was free to decide not to answer [the officer's] questions."). *Id.* Although Alabama has a stop and identify statute, ALA. CODE § 15-5-30 (1975), reasonable suspicion is required before an officer can demand identification under this statute, and mere refusal to produce identification does not in and of itself constitute reasonable suspicion. *Hibel v. Sixth Judicial Dist. Ct. of Nevada*, 542 U.S. 177, 184 (2004); *Brown v. Texas*, 443 U.S. 47, 52 (1979). Therefore, Metz has pleaded a valid Fourth Amendment violation, and it was clearly established at the time Bridges handcuffed Metz by the above-cited Supreme Court and Eleventh Circuit precedent that police cannot detain a subject for simply refusing to provide identification in a consensual encounter.

In addition, the Complaint does not allege, and the video evidence does not conclusively show, any facts suggesting that other criminal activity—like trespassing—could reasonably be suspected when Officer Bridges handcuffed Metz. Alabama's criminal trespass statute states: "A person is guilty of criminal trespass in the third degree when he knowingly . . . remains unlawfully in or upon premises." ALA. CODE § 13A-7-4(a). "A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person." ALA. CODE § 13A-7-1(3). Construing the allegations and video in Metz's favor, Officer Bridges had no knowledge that Metz was

15

ordered to leave the building and refused prior to his arrival.[4] Therefore, Officer Bridges did not have reasonable suspicion or arguable reasonable suspicion to seize Metz for trespassing simply by virtue of him being present in the lobby of a public building. *See Dunn*, 464 F. Supp. 3d at 1366 (finding that, at the motion to dismiss stage, the court could not accept the defendants' argument that any reasonable officer, knowing what they knew at the time, would arrest the plaintiff—who was videoing in City Hall—for prowling).

Accordingly, at the current motion to dismiss stage of the litigation, Officer Bridges is not entitled to qualified immunity on Metz's Fourth Amendment illegal seizure/false arrest claim.

### B. Illegal Search Claim Against Officer Dodson

Count II is a Fourth Amendment illegal search claim against Officer Dodson. Compl. (Doc. 1) ¶¶ 25-27.

The Fourth Amendment prohibits unreasonable searches, and warrantless searches are per se unreasonable unless an exception to the warrant requirement applies. *Arizona v. Gant*, 556 U.S. 332, 339 (2009). Officers conducing a valid *Terry* stop may pat down the subject's outer clothing to search for weapons. *Terry*, 392 U.S. at 24-27; *Arizona v. Johnson*, 555 U.S. 323, 330 (2009). The sole justification for a pat down search is the protection of the police officer and others nearby. *United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019). An officer conducting a pat down search may only continue the

---

[4] The undersigned takes no position on whether the security guard's order for Metz to leave the lobby of a public building for filming should be considered lawful for purposes of the Alabama trespass statute.

16

search beyond the outer clothing and into the subject's pocket if he feels a concealed object that he reasonably believes could be a weapon. *Id.*

Metz alleges in his Complaint that Officer Dodson searched his pockets looking for an identification card approximately 30 minutes after Officer Bridges handcuffed him. Compl. (Doc. 1) ¶ 15. When viewed in the light most favorable to Metz, nothing in the video clearly contradicts this allegation. This was not a permissible *Terry* pat down because Officer Dodson was not looking for a weapon, and he went beyond Metz's outer clothing into his pockets. *Johnson*, 921 F.3d at 997. In addition, the timing is suspect because Metz had already been handcuffed for over 30 minutes at the time of Officer Dodson's search, and the need to search weapons at that point seems quite attenuated.

If Metz were under lawful custodial arrest, Officer Dodson would be permitted to fully search him including his pockets under the incident to arrest doctrine. *United States v. Robinson*, 414 U.S. 218, 234-35 (1973). However, reading the allegations in the Complaint and viewing the video evidence in the light most favorable to Metz shows that he was merely detained, not arrested. The video shows that Metz was handcuffed for approximately 54 minutes. During this entire time, he remained in the DHR lobby. Police never took him to their vehicles or transported him to the station. They never told him he was under arrest, and he was never booked, charged, or even issued a citation for any crime. Rather, when Metz told Officer Bridges that he would only provide his information *on threat of arrest,* Metz video (Doc. 39) at 40:52, police eventually removed his handcuffs and told him he was free to leave. These facts establish detention, not custodial arrest.

17

Turning to the qualified immunity analysis, no reasonable officer in Officer Dodson's position could have believed that it was lawful to search Metz's pockets for his identification. The bounds of a lawful search of a detained subject were clearly established by *Terry*, 392 U.S. at 24-27, as explained in *Arizona v. Johnson*, 555 U.S. at 330 and *United States v. Johnson*, 921 F.3d at 997. Under the circumstances here, no reasonable officer could have concluded that Metz was under lawful custodial arrest. Accordingly, Metz has stated a valid Fourth Amendment illegal search claim, and Officer Dodson is not entitled to qualified immunity at this stage of the litigation.

## VII.   CONCLUSION

For the above reasons, the undersigned Magistrate Judge **RECOMMENDS** that Defendants' Joint Motion to Dismiss (Doc. 10) be **DENIED**. It is further

ORDERED that the parties shall file any objections to this Recommendation **on or before February 28, 2023**. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH

CIR. R. 3-1.  *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 14th day of February, 2023.

_____
Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE